UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:07CV94

| | |
|---|---|
| EQUAL EMPLOYMENT ) | |
| OPPORTUNITY COMMISSION, ) | |
|     Plaintiff, ) | |
| ) | **ORDER** |
| v. ) | |
| ) | |
| FAIRBROOK MEDICAL CLINIC, P.A., ) | |
|     Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the court on Defendant's Motion for Summary Judgment and Memorandum in Support (Documents #12-13), filed August 1, 2008, Plaintiff's Brief in Opposition (Document #16), filed August 18, 2008, and Defendant's Reply (Document #17), filed September 9, 2008. This matter is now ripe for disposition.

## FACTS

Plaintiff, the United States Equal Employment Opportunity Commission ("EEOC"), brought this action seeking relief on behalf of Deborah Waechter, M.D. ("Waechter") for allegedly harassing behavior committed by Defendant's sole owner, John W. Kessel, M.D. ("Kessel"). In particular, Waechter alleges that a series of incidents occurring during the approximately three year period of her employment with Kessel created a hostile work environment that amounted to discrimination against her on the basis of her sex.

Waechter began working at Defendant Fairbrook Medical Clinic ("Fairbrook") in December 2002 as a family practitioner. She remained with Fairbrook until March 2006, when she resigned to pursue an opportunity with Caldwell Memorial Hospital. This new job offered Waechter a higher

1

salary and also shortened her daily commute. (Waechter Dep. 20-23, 132, 149.) During the course of her employment with Fairbrook, Waechter had at least two other opportunities to accept employment with different medical practices, which she declined. Prior to starting work with Fairbrook, Waechter was employed by another medical practice in the Hickory area. She quit that job after several months because the physician in charge was "very difficult to deal with." Id. at 137-39.

On June 27, 2006, more than three months after leaving the employ of Fairbrook, Waechter filed a charge of discrimination and harassment with the EEOC. The following allegations form the basis of her complaint.[1]

Shortly after Waechter's employment began, Kessel showed Waechter an x-ray image of himself that included an abnormal hip and the shadow of a penis. Kessel referred to the penis image as "Mr. Happy." (Waechter Dep. 62-63.) Subsequently, Kessel showed the same image approximately twenty-five or thirty other times to such individuals as physicians, medical students, other providers, and drug sales representatives.[2] On roughly ten of these occasions, Kessel referred to the image of the penis as "Mr. Happy." Id. at 70-71.

During a staff meeting, Kessel told staff members that he was "glad his wife had a C-section because she still had such a nice tight pussy." (Waechter Dep. 71-72.) Although Waechter was absent from this meeting, the comment was reported to her by other Fairbrook employees. Waechter

---

[1] As is appropriate for the party opposing summary judgment, the facts are presented in the light most favorable to Waechter unless otherwise noted, and all factual disputes have been resolved in her favor.

[2] Kessel claims that the x-ray was one of a series of teaching x-rays used to instruct other doctors and medical students. (Kessel Dep. 55-56.) Waechter acknowledges that Kessel did keep a box of x-rays for teaching purposes. (Waechter Dep. 67.)

2

also alleges that Kessel mentioned his sex life to her on other occasions. During one of these conversations, Kessel similarly remarked that he was glad that his wife had not given birth vaginally because her muscles were still tight. Id. at 73-74.

In the fall of 2004, while Kessel was being treated by a physical therapist in an examination room at Fairbrook, he opened the door to the room, exposed his shirtless chest, and said "Hey Deborah, don't you want to come in here?" (Waechter Dep. 80.)

At a Christmas luncheon where the Fairbrook staff exchanged gifts, Kessel received a breast-shaped stress ball as a "gag gift" from the Fairbrook front office manager. (Sharpe Dep. 53.) After receiving the gift, Kessel began squeezing the ball in front of the staff who were present and commented that he "could get used to this" (or something else to that effect). (Samaroo Dep. 46-47.) The record does not show that Dr. Waechter was aware of this incident.

In March 2005, Kessel treated one of Waechter's patients while she was visiting her husband in Washington, D.C. Kessel told the patient that Waechter had gone to Washington, D.C. to get pregnant and that she and her husband would probably be "screwing the whole time." (Waechter Dep. 81-83.) This patient informed Waechter of Kessel's comments at her next appointment.

On two or three occasions in October 2005, when Waechter was nine months pregnant, Kessel commented "about how big [her] breasts were getting and how fat [she] was getting." (Waechter Dep. 87.) After Waechter told him that the comments were inappropriate, Kessel responded, "Well you know I'm a breast man. I like breasts." Id. at 88.

Waechter took maternity leave from the end of October until December 2005. On her first day back at work, Kessel told Waechter that she had "slimmed down" from her pregnancy, "except in [her] breasts." (Waechter Dep. 99.) After Waechter returned, she was allowed to pump milk from

3

her breasts while at work. According to her testimony, several instances of harassment were related to this activity. For example, Kessel asked Waechter if he could see her breasts and whether Waechter had a better sexual libido while she was pumping, and Kessel told Waechter that she was "probably a wild thing in bed." Id. at 99-101. Kessel also stated that Waechter owed him big for his help with an ongoing legal dispute between Waechter and a local hospital and asked when Waechter was going to let him pump her breasts. Id. at 100-01. Comments like these occurred once or twice a week from mid-December 2005 until mid-February 2006. Id. at 118. In another incident, Kessel came to get Waechter for an office meeting after she had been pumping milk. Kessel noticed that a small amount of breast milk had spilled on Waechter's desk, and Kessel told Waechter that he wanted to "lick it up."[3] Id. at 92-93. The final act in this series, and the final instance that Waechter considered harassing, occurred in early February 2006. However, Waechter continued to pump milk from her breasts until leaving Fairbrook on March 17, 2006. (Waechter Dep. 99-100, 159-60.)

Several other incidents that Waechter considered harassing occurred at various times during her employment with Fairbrook. At one point, Kessel showed Waechter a group photograph of himself, his wife, and several other couples taken on vacation in the Caribbean. The women in the photograph were topless. (Waechter Dep. 110-11.) Kessel frequently told jokes of a sexual nature, id. at 103-04, and at least two Fairbrook employees heard Kessel use the terms "slut" and/or "cunt" to describe women. (Sigmon Dep. 111-114; Sailors Dep. 24-25). However, the record does not show that Waechter was aware of these comments.

---

[3]According to another office employee who heard the exchange, after viewing the spilt milk, Kessel simply told Waechter that it "needed to be cleaned up." (Sharpe Dep. 29.) Kessel also denies ever telling Waechter that he wanted to "lick up" the drop of breast milk. (Kessel Dep. 74.)

4

In spite of these incidents, Waechter never missed any work due to stress or any other health condition related to Kessel's comments, and Waechter does not allege that Kessel's actions affected her ability to treat patients or otherwise impaired her work as a physician. (Waechter Dep. 182.) Waechter does not contend that Kessel ever propositioned her in any way, or that Kessel ever physically touched her in a sexual or offensive manner, or that she ever felt threatened, or that she ever felt that her job was dependent on how she responded to Kessel's jokes or other behavior which she now challenges as inappropriate. Id. at 108-09.

## ANALYSIS

### A. Standard of Review

Summary judgment is only appropriate when the record before the court is insufficient for a rational trier of fact to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); see also Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). When considering a motion for summary judgment, any disputed issues of fact must be resolved in favor of the non-moving party, Hawkins, 203 F.3d at 276-77, and all other facts must be viewed in the light most favorable to the party opposing summary judgment. Anderson, 477 U.S. at 255.

### B. Discussion

The central dispute in the instant case is whether Kessel's comments and actions were so severe and pervasive as to alter the conditions of Waechter's employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Title VII is not a "general civility code," Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), and "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege of employment' within the meaning of Title VII." Meritor, 477 U.S. at 67. "In order to clear the high threshold of actionable harm," E.E.O.C. v. R&R

5

Ventures, 244 F.3d 334, 339 (4th Cir. 2001), conduct that creates a hostile work environment must be both objectively and subjectively offensive and abusive. Faragher, 524 U.S. at 787. When determining whether an environment is sufficiently hostile or abusive, a court should examine "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 787-88 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). The court should also be aware of "the social context in which particular behavior occurs and is experienced by its target." R&R Ventures, 244 F.3d at 340 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). "The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment." Oncale, 523 U.S. at 81.

Waechter cites a number of cases in opposition to Kessel's motion for summary judgment. In all of these cases, the court held that judgment as a matter of law was not appropriate on the plaintiff's claim of a hostile work environment. However, each of these cases exhibits conduct that is much more severe and pervasive than Kessel's behavior in the present case. For instance, in Ocheltree v. Scollon Prods., Inc., 152 F. Supp. 2d 856 (4th Cir. 2003) (en banc), the plaintiff's male co-workers daily subjected plaintiff, the only female employee, to graphic and degrading descriptions of their sex lives, presented graphic pornography to the plaintiff, composed a sexually explicit jingle with the plaintiff as the subject, and performed sex acts on the shop's female mannequin. The court in that case found that all of these actions were directed at the plaintiff with the intent to humiliate and disturb. As a result of the harassment, the plaintiff felt "embarrassed, humiliated, angered" and "totally down all the time." The plaintiff began to find it difficult to be around groups of people and

6

resorted to taking antidepressants.

In R&R Ventures, 244 F.3d 334, 337, a male supervisor bombarded a fifteen year old female employee with daily sexual jokes and discussions of sexual positions and sexual experiences, repeatedly asked plaintiff if she liked to be spanked, often said women were stupid as compared to men, and told plaintiff when she bent over that she was giving him a "cheap thrill." As a result of these comments, the plaintiff "suffered an eating disorder and lost a significant amount of weight in an effort to avoid attracting attention to her body." Id.

Finally, in Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir. 2002), the plaintiff was the subject of a "barrage" of sexual comments from multiple sources, including her supervisor. This man made vulgar remarks about plaintiff's breast and buttocks daily, stated numerous times that he had been told that "black women had the best p* * *y," that "you hadn't f* * *ed until you have been with a black woman," and that all plaintiff needed was "a good f* * *." Id. at 456 (alterations in original). In addition, this same manager touched plaintiff inappropriately more than once, routed one of her calls to a phone sex line, and told the plaintiff that "if he ever caught her driving on a certain road, he would 'f* * * [her] in the a* *." Id. (alterations in original). Other comments made by other male employees were equally disturbing.

The conduct in the present case is not severe or pervasive enough to clear the "high threshold" established by these past cases, and which is intended to prevent Title VII from becoming a general civility code. First, Kessel's allegedly harassing behavior was not particularly frequent. Over the two month period when Kessel's remarks were most concentrated, Kessel's inappropriate comments occurred only once or twice a week. The other incidents were scattered over a period of almost three years. Second, other than Kessel's request to pump Waechter's breasts, Kessel's actions

7

were not particularly severe, either. Many of the supposedly harassing incidents were not directed at Waechter or were the type of crude jokes that do not run afoul of Title VII. See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (holding that Title VII does not "purge the workplace of vulgarity" or "create a federal remedy for all offensive language and conduct"). Lastly, Waechter never missed work or felt severe psychological stress as a result of Kessel's actions, Kessel's conduct was not physically threatening, and Kessel never made any type of inappropriate physical contact with Waechter.[4] Because the conduct in this case is neither severe nor pervasive, Fairbrook's motion for summary judgment will be granted.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Defendant Fairbrook Medical Clinic's Motion for Summary Judgment is **GRANTED**.

Signed: April 2, 2009

*Richard L. Voorhees*
Richard L. Voorhees
United States District Judge

---

[4] In contrast, in Ocheltree, Anderson, and Hopkins the harassment was a daily occurrence, was physically threatening, and was more vulgar and more explicit. In one case, the harassment included physical touching. In the two others, the harassment exacted a physical and psychological toll on the plaintiffs that has not been shown in this case.